IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 7:19-cr-004 |
| | ) | |
| JAMES M. HALE | ) | By:   Michael F. Urbanski |
| | ) | Chief United States District Judge |

## MEMORANDUM OPINION

This matter comes before the court on defendant James M. Hale's supplemental motion to suppress evidence, filed on April 21, 2023. ECF No. 185. The government filed its response on May 5, 2023. ECF No. 186. The court heard argument on the motion on June 7, 2023, Suppression Hr'g Tr., ECF No. 192 (hereinafter "2023 Tr."), and the motion is now ripe for the court's consideration.

As discussed more fully below, the court **DENIES** Hale's supplemental motion to suppress, finding no reason to change its prior ruling that "there was reasonable articulable suspicion to stop the black BMW, and that there was a sufficient basis to conduct the frisk of Mr. Hale to find the gun." Initial Suppression Hr'g Tr., ECF No. 116, at 58 (hereinafter "2019 Tr."); Order Den. Initial Mot. To Suppress, ECF No. 64. The court further finds the seizure of Hale at the traffic stop did not rise to the level of a custodial arrest.

## I. Background

### A. Factual Background

The motion before the court concerns the investigatory stop, search, and seizure of Hale on the afternoon of November 30, 2018. Testimony at the initial suppression hearing established that Detective Richard Bridges and other members of the Roanoke Regional Drug

1

Task Force were conducting surveillance near the Foodway Market when they observed what they believed to be a hand-to-hand drug transaction in the Foodway Market parking lot involving the driver of a black BMW. As events later revealed, Hale was a passenger in the black BMW. 2019 Tr., ECF No. 116 at 9, 12, 29, 31. Officers testified at the initial suppression hearing that the Foodway Market area was a "known high drug, high crime area." Id. at 11. Detective Bridges testified that "[o]n a weekly basis, we've conducted multiple controlled purchases in this parking lot. We've also observed other hand-to-hand transactions on multiple occasions in this parking lot." Id. Bridges testified as to a transaction between Tiffany Gibson, "a heroin addict that I've had previous dealings with," id. at 12, and the driver of a black BMW. Id. at 12, 36. Gibson, a passenger in a vehicle in the Foodway Market parking lot, exited her vehicle after a black BMW pulled into the lot. Id at 12. The driver of the BMW waved Gibosn off, then followed her back to her vehicle, where he handed her something. Id. at 12–13. This transaction also was observed by Detective Joseph Flippin. Id. at 36–37.

Detective Flippin testified that he observed a white GMC SUV enter the Foodway Market parking lot. Flippin watched someone exit the GMC, walk across the parking lot, and use his cell phone. Id. at 37-38. The GMC then left the parking lot, drove across the street, "and backed in as if they were waiting on someone." Id. at 38. The BMW then left the parking lot. The GMC followed the BMW, and Virginia State Police Special Agent Meredith Southern followed both vehicles. Id. at 14, 30, 38–39.

Special Agent Southern saw the BMW pull over near the intersection of Blaney Avenue and Dunbar Street. Id. at 15, 30–31. Southern testified that the "white GMC then stopped in the middle of the roadway, which caused my vehicle to be blocked in, that I could not go

anywhere but sit behind the two vehicles." Id. at 31. Southern testified that she observed the driver of the black BMW drop a small item into the passenger window of the GMC. Id. The white GMC and black BMW then headed in different directions. Id. at 31–32.

Detectives Flippin and Knicely, who were in radio contact with Special Agent Southern, followed the GMC to a nearby gas station and approached it. Id. at 39–40. Upon questioning, the driver of the GMC became visibly upset and gave Flippin "a clear baggie corner with an off-white powdery substance consistent with heroin in the packaging." Id. at 40. The driver said that she obtained the baggie from someone she had just met who was driving a black BMW. Id.

Detective Bridges notified Officer Paul Maddy of the Roanoke City Police Department that the black BMW had been involved in a drug transaction and asked him to stop the BMW. Id. at 42–46. Officer Maddy did so. Upon approaching the BMW, Maddy told the occupants "that it reeks of marijuana." Id. at 47; Dashcam Video, Defense Ex. 2, June 7, 2023 Hr'g, at 00:46–00:47. Bridges arrived on the scene, approached the car from the passenger's side, and also noted the odor of marijuana. 2019 Tr., ECF No. 116 at 21. Bridges asked the passenger, later identified as Hale, if "there were any weapons in the vehicle, specifically stating knives or guns." Id. at 21. Hale replied that "there were no knives in the vehicle." Id. Bridges then asked, "[s]o do you have a gun?" Id. Hale "began to reach down towards his waistband area," id., and Bridges "told him to put his hands in the air." Id. Bridges testified that "I then reached inside the window to lift up the front of his sweatshirt to see his waistband area; when doing so, I could feel something heavy in his front right jacket pocket." Id. at 22. Bridges asked if that was where the gun was, and Hale "just kind of looks down." Id. Bridges "retrieved a

3

firearm from his right jacket pocket and sat it on top of the roof of the vehicle." Id.  To this point, the stop had lasted approximately six minutes.

## B. Procedural Background

Hale was indicted by a federal grand jury on January 18, 2019, for possession of a firearm after having been convicted of a crime punishable by more than one year, in violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress evidence on July 10, 2019, which the court denied on August 28, 2019. The court found the circumstances preceding the arrest and frisk were "more than sufficient to establish that the stop of the black BMW was supported by reasonable, articulable suspicion of drug activity," and "the officer was justified, for safety reasons, in lifting Hale's shirt to reveal the pistol tucked in his waistband."[1] Order Den. Initial Mot. To Suppress, ECF No. 64 at 1–3; 2019 Tr., ECF No. 116 at 62–63.

Hale pled guilty without a plea agreement, Guilty Plea Form, ECF No. 78, and was sentenced to a term of imprisonment of 65 months. J., ECF No. 105. He filed an appeal and challenged the court's order on the suppression motion. ECF No. 104. The Fourth Circuit Court of Appeals dismissed the appeal, finding it to be barred by his unconditional guilty plea. Order, ECF No. 121. Hale next filed a § 2255 motion for habeas corpus relief, arguing that he had received ineffective assistance of counsel when he entered his guilty plea because his attorney had erroneously advised him that entering an open plea would preserve his right to appeal the suppression issue. Mot. to Vacate, ECF No. 128. The government agreed that Hale had received ineffective assistance of counsel, and the Fourth Circuit subsequently vacated

---

[1] The court notes that the firearm was not found in Hale's waistband, but in his right front jacket pocket. 2019 Tr., ECF No. 116 at 21.

Hale's conviction and sentence. Order Granting Mot. to Vacate, ECF No. 144. Hale was released on bond by Order dated March 17, 2023. ECF No. 172.

On remand, the parties executed a new plea agreement allowing Hale to file a supplemental motion to suppress. Plea Agreement, ECF No. 180, at 10; Suppl. Mot. to Suppress, ECF No. 186. The court heard argument on the motion to suppress on June 7, 2023.

## II. Supplemental Motion to Suppress

The proponent of a motion to suppress has the burden of proving that his Fourth Amendment rights were violated by the challenged search or seizure. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." United States v. Bello-Murillo, 62 F. Supp. 3d 488, 492 (E.D. Va. 2014) (citing United States v. Matlock, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974))("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."). When deciding a motion to suppress, the district court makes findings of fact and conclusions of law. United States v. Stevenson, 396 F.3d 538, 542 (4th Cir. 2005). "'At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'" Bello-Murillo, 62 F.Supp.3d at 492 (quoting United States v. McKneely, 6 F.3d 1447, 1452–53 (10th Cir.1993)).

Having heard argument and considered the briefing, the court **DENIES** Hale's supplemental motion to suppress. First, the evidence in the record supports a finding that the stop of the BMW was founded on reasonable articulable suspicion, and Hale has not presented any new evidence or case law to support a different conclusion. Second, the frisk of Hale while seated in the vehicle was constitutional based on the smell of marijuana from the car and Hale's equivocal response to Detective Bridges' questions. Third, the seizure of Hale did not rise to the level of an arrest because Hale remained inside the vehicle for six minutes before the gun was found.

### A. Reasonable Suspicion

In investigative "Terry stops," an officer conducting a stop for the purpose of questioning "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). The reasonable suspicion standard "is a less demanding standard than probable cause" yet requires "at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). "The burden is on the Government to prove that reasonable suspicion justified a warrantless seizure." United States v. Critchfield, No. 22-4063, 2023 WL 5618951 (4th Cir. Aug. 31, 2023) (citing United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018). "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993); cf. United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011) (maintaining deference to officers is

not given blindly, and "the Government must do more than simply label a behavior as 'suspicious' to make it so").

In Critchfield, the Fourth Circuit noted a few salient features of reasonable suspicion, as follows:

> The suspicion must be articulable—that is, the officer must be able to articulate objective reasons for his suspicion. A mere hunch or inchoate and unparticularized suspicion will not do. At the same time, [courts] give due weight to the inferences and common sense judgments reached by officers in light of their experience and training in identifying suspicious circumstances that may appear unremarkable to a layman. Facts innocent of themselves may together amount to reasonable suspicion.
>
> The suspicion also must be particularized; an investigatory stop must be justified by an objective basis to suspect that the particular person stopped is, or is about to be, engaged in a particular crime.

2023 WL 5618951, at *2 (internal citations and quotations omitted).

In making the reasonable suspicion assessment, courts "consider the totality of the circumstances to determine whether the facts known to the officers at the time of the stop objectively gave rise to reasonable suspicion." Id. at *3.

In assessing the totality of the circumstances, the court first considers the relevant—though not decisive—fact that the Foodway Market is in a "known high drug, high crime area," per the officers' testimony. The personal and professional experience of the officers is enough to establish the existence of a high crime area. See Lender, 985 F.2d at 154 ("[A]n area's propensity toward criminal activity is something that an officer may consider [when making a stop]."). "Reasonable suspicion is a commonsensical position" and police are often in an effective position to determine whether an area has a "propensity toward criminal

activity." Id. The officers articulated this experience multiple times in their respective testimonies, saying "it's a known high crime area, high drug area," with Special Agent Southern likening the scene to "an open-air market" for drugs. 2019 Tr., ECF No. 116 at 9, 11, 23, 28. While this fact "carries no weight standing alone," "an area's disposition toward criminal activity is an articulable fact that may be considered along with more particularized factors to support a reasonable suspicion." Sprinkle, 106 F.3d at 617 (citations omitted).

Hale disputes the officers' allegations that they initially observed him in a "high crime area," asserting that they provided no evidence to support their claim. Suppl. Mot. to Suppress, ECF No. 185 at 4. At the hearing, Hale argued that the court should not conclude that the area around the Foodway Market was a "high crime area" because the government had provided no data showing that to be true. See 2023 Tr., ECF No. 192 at 9, 15, 66–68. Hale cites no authority in support of his argument that a court must have before it objective data of the incidence of crime in an area before it can credit police officers' testimony about whether an area is known to have a high incidence of crime or drug transactions. To the contrary, the Fourth Circuit has observed that "[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires in the street." Lender, 985 F.2d at 154.

Hale questions Bridges' credibility because Bridges testified at the 2019 hearing that he was at the Foodway Market conducting surveillance of a "known high drug, high crime area," but on a contemporaneous body cam video recording Bridges stated that he was in that area watching a car across the street owned by Charlie Doss which was suspected to contain narcotics. On the body cam video recording, Detective Bridges stated: "I was sitting in the lot

just watching the car across the street, and Tiffany pulls in and I'm like huh, and then he pulls in." Body Cam Video, Defense Ex. 2, June 7, 2023 Hr'g, at 00:54-1:00. Bridges explains "we were watching Charlie Doss's car that had all the dope in it and this just happened at the store." Id. at 00:17-00:23. Hale asserts that Detective Bridges was "less than honest" about his reason for being at the Foodway Market and argued that the court should not credit his earlier testimony that he was conducting surveillance in a high drug, high crime area. 2023 Tr., ECF No. 192 at 16–17.

During the June 7, 2023 hearing, Detective Bridges viewed the body cam video and agreed that he said on the video that he was watching a car owned by Charlie Doss suspected to contain narcotics across the street from the Foodway Market. Id. at 63. Conducting surveillance at a high drug, high drug area and watching a vehicle in that area suspected to contain narcotics are not necessarily inconsistent. As Bridges explained, "[w]e have actually on multiple occasions conducted controlled purchases on this lot or sat on this lot on other occasions as well just conducting surveillance and witnessed these same type of incidents before." Id. at 63. Consistently, Detective Bridges added:

> If we don't have a planned operation or a planned controlled purchase, our objective is just riding around these high crime areas, high drug areas, if we stumble across someone that we know that is involving in narcotics or violent crime, we will follow that person. If that person leads us say to a residence or to a store, we will set up in position where we will conduct surveillance on them. In this instance they were at a house which then allowed us to sit at the Foodway Market, which is also another area, and in this instance, while I do say on that video that we are conducting surveillance on Charlie Doss across the street, while I'm sitting in the Foodway Market, I then see a female who I know, Tiffany Gibson who is known narcotic user, self-admitted, pull into that parking lot. So because we have nothing planned, nothing on paper, there's no specific operation going on, my

> attention is now drawn to her, which is where I am now doing that surveillance on the Foodway Market which then what occurs with the BMW occurs, and that's kind of how we rolled into that situation.

Id. at 71–72.

The court disagrees with Hale that Detective Bridges was not credible as to his testimony that he witnessed a hand-to-hand drug transaction between the driver of the BMW and Tiffany Gibson in the Foodway Market parking lot. First, Bridges' testimony that he observed the driver of the BMW hand something to Gibson in the Foodway Market parking lot is not undermined by the body cam video. Rather, Bridges' testimony as to the hand-to-hand drug transaction he observed in the parking lot is consistent with his statement on the body camera footage that "we were watching Charlie Doss's car that had all the dope in it and this just happened at the store." Body Cam Video, Defense Ex. 2, June 7, 2023 Hr'g, at 00:17–00:23.

Second, Detective Flippin, who was in a different vehicle also conducting surveillance there, corroborated Bridges' account. Bridges testified that he saw Gibson approach the BMW and get waved off by the driver, after which he saw the driver of the BMW exit his car and "hand Gibson something as he is at her car." 2019 Tr., ECF No. 116 at 12. Although his vantage point was different, Detective Flippin consistently testified that he saw Tiffany Gibson approach the BMW and return to her car. Id. at 36. After that, Flippin saw "the black male approach the area of the passenger door where Ms. Gibson was standing, in a very close proximity, and at that point, within a matter of seconds, walk away and return to the BMW." Id. at 36–37.

Third, Special Agent Southern observed a second hand-to-hand transaction involving the driver of the black BMW shortly after it drove away from the Foodway Market. Special Agent Southern testified that after leaving the Foodway Market, the black BMW and the white GMC SUV stopped near the intersection of Dunbar Street and Blaney Avenue. Special Agent Southern testified that she "observed a black male at the passenger window of the white GMC. When I observed him at the window, I could see him dropping a small item into the vehicle. I can't say 100 percent what it was, but it was consistent with what a drug transaction would be." Id. at 31. After dropping off the small item, the driver of the BMW returned to his car. Id. In this respect, Southern's testimony also tracks that of Detective Bridges, who testified that as he was driving, he saw the driver of the BMW "walking away from the BMW towards a white GMC SUV." Id. at 15.

Flippin testified that a few minutes later he approached the white GMC SUV at a nearby Sheetz parking lot. Upon questioning, the driver of the GMC showed Flippin "a clear baggie corner with an off-white powdery substance consistent with heroin in the packaging," id. at 40, which she had obtained from the driver of the black BMW. Flippin testified that officers observed two hand-to-hand drug transactions before the BMW was stopped, explaining as follows:

> The first transaction was made that Detective Bridges had observed at the Foodway Market. At that point, when the vehicles went mobile, Detective Bridges made contact with Officer Maddy at that time. He at that point began responding to the area. We had all anticipation of stopping the vehicle based off of what was seen after the first hand-to-hand transaction. We were not going to wait for a second one. It just happened that a second transaction took place before Officer Maddy was able to conduct the stop.

Id. at 43. In short, regardless of Detective Bridges' testimony regarding the reason why he was at the Foodway Market, the evidence is clear that based on the two suspected hand-to-hand drug transactions observed by multiple officers, there was ample reasonable suspicion to stop the black BMW. [2]

Hale next argues that based on United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997), the officers did not have reasonable suspicion to perform an investigatory stop of the BMW. Suppl. Mot. to Suppress, ECF No. 182, at 1–2; 2023 Tr., ECF No. 192 at 8–10. In Sprinkle, the Fourth Circuit found a lack of reasonable suspicion for a stop when an officer's observation was limited to seeing two individuals, one of whom had prior drug convictions, in a car "huddle toward the center console . . . with their hands close together" while in a "high crime area." Id. at 617–18. Hale argues that, in this case, the officers similarly did not observe any contraband or an otherwise suspicious interaction between Kelly and the alleged buyers. Suppl. Mot. to Suppress at 8.

The scenario in this case is distinct from Sprinkle, where the observing officers did not actually see that anything of a criminal nature was happening in the car. Sprinkle, 106 F.3d at 618. In contrast to Sprinkle, the investigating officers in this case testified they saw "something" change hands. 2019 Tr., ECF No. 116 at 17, 31, 33. The officers saw a car pull into a parking lot; a woman known to be a drug user by officers exit her vehicle; the driver "wave[] for the female to go back to her car;" the driver walk over to her vehicle; and the transfer of an item consistent with a drug transaction—per the officers' experience—in a

---

[2] Hale also sought to discredit Detective Bridges by pointing out on cross-examination that in a separate matter Bridges had been found to act "with reckless disregard for the truth." 2023 Tr., ECF No. 192 at 56. Evaluating the entirety of Detective Bridges' testimony, the court found him to be a credible witness.

parking lot known to be used for drug trafficking. The same is true from Agent Southern's perspective during the second transaction. She testified that she was in her car, three feet from the passenger side of the GMC: "When I observed him [the driver of the BMW] at the window [of the white GMC], I could see him dropping a small item into the vehicle." Id. at 31. Because several officers in this case observed items changing hands, Sprinkle offers no relief to Hale.

The officers' extensive experience in drug investigations further supports a finding of reasonable suspicion. See United States v. Smith, 962 F.3d 755, 767 (4th Cir. 2020) ("[I]t is well-settled that experience-derived police testimony concerning criminals' typical modi operandi during a drug transaction may qualify as lay opinion under [Fed. R. Evid.] 701.") (internal quotations omitted). Their shared inference that they had most likely observed a drug transaction stems from their experiences in drug investigations. At the time of this investigation in 2019, Detective Bridges had participated in "over 200" drug surveillances over a 5-year period, 2019 Tr., ECF No. 116 at 8–9; Special Agent Southern participated in "well over 500" drug surveillances over an 8-year period, id. at 27; and Detective Flippin had participated in "more than 300" drug investigations since 2012, id. at 35. Accordingly, the court finds the officers who observed the suspicious conduct properly based their inferences on their training and experience with drug investigations, and their suspicions were reasonable.

Hale also suggests the stop was motivated by racial bias or profiling by the officers. Suppl. Mot. to Suppress, ECF No. 185 at 2, 8; 2023 Tr. at 14–15, 19. Specifically, Hale suggests the officers "stopped two Black men who were in a BMW because they saw a white woman exchange something with the driver of the parking lot of a convenience store." Suppl. Mot. to Suppress at 8. However, Hale has not introduced more than speculation of racial bias to

support his claim, and the government presented testimony from several officers that they executed the stop based on their first-hand observations and reasonable suspicions of illicit conduct.

Considering the whole picture of what transpired before the stop, the court finds the officers possessed reasonable suspicion to initiate the investigatory stop. The probable cause standard is met when officers witness the actual exchanging of drugs for money, but, as both parties acknowledge and law plainly establishes, that is not the legal standard for a Terry stop. See Wardlow, 528 U.S. 119 at 123. Officers placed their observation of conduct "consistent with a drug transaction" in the context of their extensive experience to infer that they observed two hand-to-hand drug deals involving the driver of the BMW. This observation and rational deduction is sufficient to establish reasonable suspicion under Terry, justifying the lawful stop of the BMW.

Finally, this conclusion is not undermined by the Fourth Circuit's recent decision in Critchfield. In that case, the Fourth Circuit concluded that the officers lacked objectively reasonable suspicion that Critchfield had been engaged in theft to justify stopping him. Unlike the facts of this case, where multiple officers observed the driver of the black BMW engage in hand-to-hand drug transactions, the stop in Critchfield was based solely on communications with a tipster, and "no officer testified as to any specialized basis he had for interpreting these circumstances as indicative of criminal activity, like a common criminal modus operandi or a location with frequent thefts." 2023 WL 5618951, at *5. As the court in Critchfield concluded, "reality matters for reasonable suspicion," id., and the reality of this case is that two officers witnessed the driver of the black BMW hand an item to a known drug user in the Foodway

Market parking lot, a high drug, high crime area, and shortly thereafter a bit down the road another officer saw the driver of the BMW drop a small item into the passenger window of the GMC. The officers' suspicion was not the product of imagination or inchoate hunch, but rather was based on their objective observation of suspected drug transactions by the driver of the BMW in an area known for drug dealing. As such, the officers possessed reasonable, articulable, and particularized suspicion constitutionally sufficient to lawfully stop the BMW.

### B. Search of Hale

Hale next argues that it was unreasonable for Detective Bridges to "frisk" him while sitting in the passenger's seat because he had no reason to suspect Hale was armed or dangerous as Hale remained "calm" and "cooperative" with the officers. Suppl. Mot. to Suppress, ECF No. 185 at 8–9. The government contends the search was reasonable based on Officer Maddy's observation that the car "reeks of marijuana," and the officers thus possessed reasonable suspicion to believe that there were illegal drugs in the vehicle. In those circumstances, the law allows them to inquire about guns to protect their own safety. Resp. in Opp'n to Def.'s Suppl. Mot. Suppress at 14–15.

The Fourth Circuit's decision in United States v. Sakyi, 160 F.3d 164 (4th Cir. 1998), is instructive. After engaging in a thorough summary of Supreme Court law regarding searches following a lawful traffic stop, the Sakyi court held that "[b]ecause a frisk or 'pat down' is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that an officer must have justification for a frisk or a 'pat-down' beyond the mere justification for the traffic stop." Id. 169. The court next noted that in Terry and Michigan v. Long, 463 U.S. 1032 (1983), the Supreme Court permitted frisks only when an officer perceives an

appropriate level of suspicion of criminal activity and apprehension of danger. Sakyi, 160 F.3d

at 169. The court then concluded that the showing may be satisfied "by an officer's objectively

reasonable suspicion that drugs are present in a vehicle that he lawfully stops." Id. In addition,

the court held the following:

> Moreover, when drugs are suspected in a vehicle and the
> suspicion is not readily attributable to any particular person in the
> vehicle, it is reasonable to conclude that all occupants of the
> vehicle are suspect. They are in the restricted space of the vehicle
> presumably by choice and presumably on a common mission.
> Furthermore, as we have previously noted, guns often
> accompany drugs. See [United States v.] Stanfield, 109 F.3d [976,]
> at 984 [(4th Cir. 1998)]; United States v. Perrin, 45 F.3d 869, 873
> (4th Cir.1995) (noting that "it is certainly reasonable for an officer
> to believe that a person engaged in selling of crack cocaine may
> be carrying a weapon for protection"). In the absence of
> ameliorating factors, the risk of danger to an officer from any
> occupant of a vehicle he has stopped, when the presence of drugs
> is reasonably suspected but probable cause for arrest does not
> exist, is readily apparent.
>
> Accordingly, we hold that in connection with a lawful traffic stop
> of an automobile, when the officer has a reasonable suspicion
> that illegal drugs are in the vehicle, the officer may, in the absence
> of factors allaying his safety concerns, order the occupants out of
> the vehicle and pat them down briefly for weapons to ensure the
> officer's safety and the safety of others.

Id. See also United States v. McCoy, 773 F. App'x 164 (4th Cir. 2019) (affirming denial of a

motion to suppress a search after a traffic stop by applying Sakyi). The Fourth Circuit has held

repeatedly that "the odor of marijuana alone can provide probable cause to believe that

marijuana is present in a particular place." United States v. Humphries, 372 F.3d 653, 658 (4th

Cir. 2004) (citing United States v. Sheetz, 293 F.3d 175, 184 (4th Cir. 2002); United States v.

<u>Cephas</u>, 254 F.3d 488, 495 (4th Cir. 2001); and <u>United States v. Sifuentes</u>, 504 F.2d 845, 848 (4th Cir. 1974)).[3]

Hale argues the situation is distinct from <u>Sakyi</u> in that "this is not, like in that case, an otherwise lawful traffic stop." 2023 Tr., ECF No. 192 at 28. Hale also seeks to distinguish his conduct as calm, cooperative, and compliant while the stop was ongoing. Suppl. Mot. to Suppress at 9. These arguments are unpersuasive to overcome a presumption of danger for three reasons.

First, when questioned by Detective Bridges about the presence of knives or guns in the car, Hale did not immediately allay Detective Bridges' concerns. Rather, Bridges testified that Hale responded that he had no knives. When Bridges followed up by specifically asking about a gun, Hale reached for his waistband. After instructing Hale to raise his hands, Bridges felt something heavy in Hale's clothing. Bridges asked Hale if that was where the gun was, and Hale looked down. Detective Bridges then retrieved the firearm from Hale's front jacket pocket. 2019 Tr., ECF No. 116, at 21–22. Plainly, until the gun was retrieved, Detective Bridges' safety concerns were not allayed.

Second, Hale has not referenced any case law to support the proposition that a calm demeanor can alleviate safety concerns of officers after detecting illegal drugs; in fact, the Fourth Circuit has held otherwise. In <u>McCoy</u>, the defendant made a similar argument that his production of a valid driver's license, his being left in the car while officers ran a background check after smelling marijuana, the neighborhood not being a "high-crime area," and his

---

[3] At the time the BMW was stopped, possession of marijuana in Virginia was illegal. Adult recreational use of marijuana became legal in the Commonwealth in July 2021.

cooperative temperament all demonstrated that he was not dangerous. The Fourth Circuit disagreed, saying all these factors "do not negate the core logic behind Sakyi—that a person carrying controlled substances is likely armed." McCoy, 773 F. App'x at 166; see also Sakyi, 160 F.3d at 170 (noting defendant's "conduct was not suspicious" when the officer conducted frisk).

Third, regarding Hale's argument that Sakyi should only apply during a "lawful traffic stop," i.e., a stop after a suspected "motor vehicle infraction," and should not apply to an investigatory stop made to investigate whether a drug transaction has occurred, 2023 Tr., ECF No. 192 at 28–29, he does not cite any authority or explain why, in the context of an otherwise constitutional investigatory stop, Sakyi should not apply. Sakyi addresses steps that officers may take during a traffic stop to protect their safety, and these same concerns apply during an investigatory stop. In United States v. Foster, 824 F.3d 84, 89 (4th Cir. 2016), the Fourth Circuit appeared to assume that Sakyi applies to investigatory stops. "Even if an investigatory stop is justified by reasonable suspicion, a subsequent frisk of a suspect for weapons is not necessarily permissible." Id. (citing Sakyi, 160 F.3d at 169, for its explanation "that an officer must have justification for a frisk or a 'pat-down' beyond the mere justification for the traffic stop"). See also United States v. Blount, No. 3:19-CR-218-MOC-DSC, 2020 WL 697450, at *5 (W.D.N.C. Feb. 11, 2020) (applying Sakyi to find a protective vehicle search reasonable following an investigatory stop), and United States v. Stover, 26 F. App'x 279, 2002 WL 91093 at *2 (Jan. 24, 2002) (using "traffic stop" and "investigatory stop" interchangeably and finding officer was justified in conducting a pat-down search under Sakyi). Accordingly, the court

finds no reason to not apply Sakyi to the circumstances surrounding the officers' investigatory stop of the BMW.

Based on Sakyi, because Officer Maddy and Detective Bridges smelled marijuana emanating from the BMW as they approached the vehicle, they were authorized to conduct a pat-down for weapons. Furthermore, when Hale was asked if there were any weapons in the vehicle, he "responded saying there were no knives in the vehicle." 2019 Tr., ECF No. 116 at 21. In response to a direct question about whether he had a gun, Hale "began to reach down towards his waistband area, so I told him to put his hands in the air." Id. Bridges "then reached inside the window to lift up the front of his sweatshirt to see his waistband area; when doing so, I could feel something heavy in his right front pocket. I then asked him if that was where the gun was, and he just kind of looks down. So I then retrieved a firearm from his right jacket pocket and sat it on top of the roof of the vehicle." Id. at 21-22. Both the presence of marijuana and Hale's equivocal response to Bridges' inquiry about the presence of weapons gave Bridges sufficient reasonable suspicion that Hale might have been armed. Thus, the officer was justified, for safety reasons after detecting the presence of marijuana in the car and asking Hale about weapons, to reach into the car and lift Hale's jacket to look for a gun.[4]

**C. Seizure of Hale**

Hale argues by keeping him in the car for several minutes after the driver exited the car, frisking him while he was seated, and failing to provide a basis for the stop, his seizure rose to the level of an arrest without probable cause. Suppl. Mot. to Suppress, ECF No. 185

---

[4] Because the court concludes that the investigatory stop of the BMW and pat-down of Hale for weapons were constitutional, it need not address the inevitable discovery doctrine.

at 9–10. The government responds that although there was probable cause to arrest Hale because of the marijuana smell emanating from the vehicle, he was not ever placed under arrest. Resp. in Opp'n to Def.'s Suppl. Mot. Suppress, ECF No. 186 at 16.

The court finds that the short period of time Hale was in the car prior to the discovery of the firearm does not rise to the level of a custodial arrest. The brief seizure of a passenger often occurs in traffic stops. See Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop."). The law is clear that "handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." United States v. Leshuk, 65 F.3d 1105, 1109–10 (4th Cir. 1995). In fact, "[a] brief but complete restriction of liberty is valid under Terry." United States v. Jones, 27 F. App'x 198, 200 (4th Cir. 2001) (citing United States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987)). During a stop, officers are authorized to take steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985). The court has viewed the dash cam video of the stop, lasting 5 minutes, 58 seconds. Dash Cam Video, Defense Ex. 1, June 7, 2023 H'rg.  The brief period of time Hale remained in the passenger seat of the car was justified both by the reasonable suspicion that the car contained illegal drugs based on the odor of marijuana and Hale's equivocal response to the question about weapons. Hale was only handcuffed after Detective Bridges recovered the firearm.

Defendant cites Park v. Shiflett, 250 F.3d 843, 848 (4th Cir. 2001), to support the position that "courts consider . . . the degree of force used and the time of the stop" to

determine whether something is a custodial arrest. Suppl. Mot. to Suppress at 9–10. While this is true, Park is a case involving excessive force, wrongful arrest, and false imprisonment where the Fourth Circuit found plaintiff's "freedom was curtailed to a degree associated with formal arrest" because he could not "feel free to leave after being thrown against the wall, kicked, handcuffed and locked in the patrol car." Park, 250 F.3d at 851–52. In Hale's case, he was in his car for approximately six minutes while the officer asked him if he had any weapons. Being questioned by an officer while seated in a passenger's seat during an investigatory stop does not rise to the level of the severe curtailment of liberty seen in Park. Thus, Detective Bridges' brief seizure of Hale while he was seated in the passenger seat of the BMW does not rise to the level of a custodial arrest, and the officers were justified in seizing Hale to protect their personal safety.

### III. Conclusion

In all, the court's calculus remains unchanged from its prior ruling on the initial motion to suppress because defendant has not provided new and persuasive evidence or authority to show the officers lacked reasonable suspicion to stop, search, seize, and retrieve the firearm from Hale. The fruits of that search are admissible, and the supplemental motion to suppress, ECF No. 185, is **DENIED**.

It is so **ORDERED**.

Entered: October 2, 2023

Michael F. Urbanski
Chief United States District Judge